**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                    **Case No. 2:11-CR-97-FTM-29SPC**

**JUDE SEREME**
_____/

### OBJECTIONS TO REPORT AND RECOMMENDATION

The Defendant, JUDE SEREME, by and through counsel, pursuant to Rule 59 , Fed.

R. Crim. P, hereby files his objections to the Report and Recommendation issued on March

27, 2012  and states as follows:

### BACKGROUND

On December 20, 2010, Mr. Sereme was a passenger in a rental vehicle, which was

stopped in the vicinity of Sumerlin Road and Bass Road, in Lee County. While the stated

basis of the stop was the claim of a traffic violation, Mr. Sereme was, at that time, the

subject of a drug-distribution investigation, and was monitored  traveling from Miami to Fort

Myers by tracking the location of a cellular phone he was believed to be carrying. A

quantity of cocaine was found on Mr. Sereme's person as a result of what, he maintains,

was a strip-search during the traffic stop. The cocaine was found concealed in his buttocks

area. Following his arrest, Mr. Sereme was incarcerated in the Lee County Jail, from which

he made various recorded telephone conversations, which the government maintains are

incriminating, both based upon the substance of the conversations and based upon the

1

individuals he contacted.

Several months later, a wire-tap was authorized for a telephone which was believed to belong to co-defendant Rick Jean. This phone was one of the lines called by Mr. Sereme while incarcerated. As a result of the conversations intercepted pursuant thereto, a continued intercept was later ordered for that phone, and an initial intercept was ordered for a phone believed to be in the possession of co-defendant Naheme Ductant. Conversations were, in fact, intercepted as a result. Mr. Sereme's jail calls were then used to identify his voice on the intercepted calls. The government intends to offer evidence of the cocaine, the recordings of the jail calls, and the recordings of the intercepted calls as evidence against Mr. Sereme at trial.

Mr. Sereme filed a motion to suppress, seeking suppression of the results of the search of his person, as well as all evidence which was the product of that search, including the jail conversations. On March 27, 2012, the Magistrate issued a Report and Recommendation, which concluded that this motion should be denied. Mr. Sereme herein files his objections to the Report and Recommendation.

## GROUNDS FOR SUPPRESSION

### A.    The Strip-Search Violated the Fourth Amendment

Mr. Sereme continues to maintain that the strip-search to which he was subjected violated the Fourth Amendment.

Strip-searches, and particularly the search that occurred here, are highly invasive. *See Justice v. City of Peachtree City* 961 F.2d 188, 191 (11th Cir. 1992)("We accept as axiomatic the principle that people harbor a reasonable expectation of privacy in their

'private parts.'"). *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983) ("We can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here."). In *Mary Beth G.*, the court referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G.*, 723 F.2d at 1272. For that reason, they have only been approved within the arrest, border, or school context, *i.e.*, where there is a lesser expectation of privacy and greater need for security. *See  Florence v. Board of Chosen Freeholders of the County of Burlington*, — S. Ct. —, 2012 WL 1069092, (April 2, 2012)(5-4 bare majority upheld strip search in a detention facility); *United States  v. Vega-Barvo,* 729 F.2d 1341, 1349 (11th Cir. 1984)(border), *Jenkins by Hall v. Talladega City Bd. of Educ.*115 F.3d 821 (11th Cir. 1997)(school).

    In *Lessley v. City of Madison, Ind.,*  654 F. Supp.2d 877 (S.D. Ind. 2009), which is factually similar to this case, the court addressed civil claims brought by female plaintiffs who had been strip-searched  following a traffic stop. After stopping the vehicle,  an officer smelled marijuana and searched the car. *Id.* at 889.  Finding either nothing or a trace amount of marijuana in the car, another officer searched the plaintiffs' pockets, again finding nothing. *Id.* The officers then called a female police officer who performed warrantless strip-searches on the three plaintiffs at a local fire station. *Id.*  This search resulted in the seizure of marijuana from one of the plaintiffs. *Id.* In denying summary judgment in favor of the officers, the court clearly stated that "strip searches are permitted

only in limited circumstances." *Id* at 898. In delineating these limited circumstances, the court stated "[the officer] has identified no case in this district, any circuit, or from the Supreme Court where a court approved a warrantless strip-search of an individual who was not under arrest, at an international border, or at a school." *Id.*

There is simply not even the most remote justification for the highly intrusive search which occurred in this case.

In arguing to the contrary, the government suggested: (1) that the search was consensual, and (2) that the search satisfied some generalized notion of "reasonableness," notwithstanding the absence of an articulated exception to the Fourth Amendment warrant requirement. (Doc. 144: Pgs 19-22)(Tr. Pg 173).

The Report, while rejecting the government's arguments, one explicitly and one implicitly[1], found that the search could be justified upon grounds not previously argued by the government. The Report concluded that this search was pursuant to an "investigatory detention." (Doc. 189: Pg 25). Citing *United States v. Smith*, 318 F. App'x 780, *11 (11th Cir. 2009), the Report states "an exception to the probable cause requirements exists for investigative detentions whereby 'minimally intrusive searches and seizures of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that criminal activity may be afoot.'" (quoting *United States v. Heard*, 367 F.3d 1275, 1278 (11th Cir. 2004)). (Doc. 189: Pg 25). Citing various considerations found to be suspicions,

---

[1] The Report rejected the government's position that the search was consensual, and did not address the government's general argument as to reasonableness. (Doc. 189: Pgs 24-26, 26n.3).

some articulated by the government and some not, the Report concluded "[i]t was reasonable based on totality of the circumstances for the officers to believe that criminal activity was afoot and for the officers to search Mr. Sereme in order to find the marijuana. The search was conducted in a reasonable manner and was limited to what was necessary to check what Det. Kirby felt in Sereme's buttocks area." (Doc. 189: Pg 26).

There are several problems with this reasoning. Most fundamentally, the "minimally intrusive search" during an "investigative detention" permitted pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) is limited to a search for weapons. Under *Terry*, a police officer who makes an investigative stop, may conduct a limited pat-down frisk of a suspect's outer clothing. *See Terry*, 392 U.S. at 27, 30. The frisk may only be conducted if the officer has a reasonable belief that the detainee poses a threat to the officer's safety or safety of others. *Id* at 28, *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979)(frisk of bar patron could not be justified because there was no reason to believe that the patron was armed). The Supreme Court has made explicitly clear that "[i]n the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 1325 (1983)

In *Smith*, the officer was called to the scene as a result of a complaint that the defendant had grabbed a female at a gas station parking lot. *See* 318 F. App'x at 782. When the officer arrived, the defendant was observed boarding a bus. *Id.* The officer then

had the bus stopped, and removed the defendant. *Id.*  In a fight which followed, the defendant struck the officer with a gun, which was found by other officers at the scene. *Id.* The defendant moved to suppress, arguing that his removal from the bus was an unlawful seizure. *Id.* at 792. The Eleventh Circuit concluded that there was not only reasonable suspicion, but probable cause to arrest in light of the victim's identification of the defendant as the attacker. *Id.*  Thus, *Smith* did not really involve a search issue at all, but  rather presented an issue as to whether the officers had authority to arrest and detain

 As was the case in *Smith*, *Heard*  also involved a firearm. In that case, following an argument over money, which a police officer assisted in resolving, one of the participants advised the officer that the defendant had a weapon. 367 F.3d at 1277. The officer then  handcuffed the defendant, and performed a "*Terry* -frisk," which revealed a gun in the defendant's waistband. *Id.* The court held that there was reasonable suspicion for the detention, and accordingly the protective pat-down was permissible. *id.* at 1280.

Here, no claim has been advanced that this was a protective search for weapons, as, under appropriate circumstances, an investigative detention under *Terry* would permit. To the contrary, the government conceded in its argument, "the reasonable conclusion was somebody had [drugs] on them; and the only other person who they reasonably believed to have it on them was the defendant." (Tr. Pg 171). Further, the government argued, . . . "the fact that the marijuana that the driver indicated that would be present was not present in the vehicle, that there was probable cause to search the person of the defendant." (Tr. Pg 172). This was consistent with the position of the officers.  Lt. Hedrick acknowledged

6

that the search of Mr. Sereme was to locate drugs, (Tr. Pgs 73-74) as did Detective Kirkby. (Tr. Pgs 111-113). Nor could this have been a search for weapons, as Lt. Hedrick has already searched Mr. Sereme, and found that he was unarmed. For this reason alone, the rationale set forth in the Report, that this was an investigative detention, fails to justify the search.

Even if *Terry* were to be extended to permit a search for contraband, this search could not conceivably be characterized as "minimally intrusive." The Report disputes the use of the term "strip search," based upon the fact that Mr. Sereme remained clothed with his shirt and lowered-pants while Detective Kirkby probed his genital area and buttocks through his underwear, and then caused him to lower his underwear. (Doc. 189: Pg 24). However, the Magistrate did not have the benefit of the Supreme Court's decision in *Florence* which, in defining a strip search, stated as follows:

> The term [strip search] is imprecise. It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their head or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display insteps, to expose the back of the ears, to *move or spread the buttocks or genital areas*, or to cough in a squatting position.

2012 WL 1069092, *5 (Emphasis added). The search here was obviously far more intrusive than some of the other examples of a "strip search." However, whether this can arguably be characterized as something other than a "strip search," seems of very little consequence. While both the Report and Mr. Sereme endeavor to describe the search here, it's absolute intrusiveness can only be fully appreciated by the review of the video.

*Terry* does not  come close to justifying the search which occurred here.

Alternatively, the Report suggests that there was probable cause to search Sereme. (Doc. 189: Pg 26 n.4). The Report stated, in this regard, that "the Fourth Amendment provides that seizes and searches of persons must be justified by probable cause." (Citing *United States v. Hundell*, 322 Fed. Appx 772,  *1 (11th Cir. 2009)).  While this is true, Mr. Sereme maintains that the implied corollary, *i.e.*, that the body of a person may be searched if there is probable cause, is not true. *See Lessley* 654 F. Supp.2d at 898 (warrantless strip-searches are sufficiently invasive that more than probable cause that a small amount of marijuana will be found is required).

In *Hundell*, the Eleventh Circuit concluded that the officers has reasonable suspicion to stop the defendant, based upon an unresolved 911 call for police assistance, among other factors. *Id* at 773. During a resulting frisk, the officers discovered a firearm in his possession. *Id.*  Nothing in *Hundell* suggest that even probable cause would permit a search of an individual's person beyond a pat-down search for weapons. In fact, the court confirmed "the sole purpose of the frisk is to protect the officers and others nearby." *Id.* (citing *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987)).

Mr. Sereme is unaware of any authority which provides that an individual's person, including one's most private areas, can be searched without a warrant upon probable cause. Mr. Sereme does not dispute that where there is probable cause, *and* an exception to the warrant requirement applies, an individual may be subjected to a search of his person for contraband. In *United States v. Goddard,* 312 F.3d 1360, 1362 (11th Cir. 2002)*,*

8

cited by the Report, the defendant had admitted to the officer that he had crack cocaine in his possession. When the defendant attempted to remove the drugs from his pocket, the officer retrieved the drugs himself, concerned that the Mr. Goddard might have a weapon. *Id.* The Eleventh Circuit concluded *both* that probable cause existed for the search *and* that the removal of the drugs from the defendant's pocket was "best characterized as a search incident to arrest." *Id.* at 1364. Here, there has been no suggestion of an additional Fourth Amendment exception.

While not essential to the resolution of this matter, Mr. Sereme does take issue with some of the factual claims made by the officers and the government at the hearing.

The Report suggests that the purpose of the search of Mr. Sereme's person was to locate the source of the marijuana, which was allegedly being smoked in the vehicle. (Doc. 189: Pg 25). This was the view advanced by the government. (Tr. Pg 171-172). Logic and experience suggests that the purpose of the search was to locate the *cocaine* that the agents thought Mr. Sereme might be bringing of Miami, and had nothing to do with attempting to locate a misdemeanor quantity of marijuana. There are numerous reasons to believe this. First, the stop resulted from an investigation into what was believed to be a large-scale drug distribution organization. The agents investigating the drug organization stood by, awaiting the results of the traffic stop. Over a half-hour was spent searching the vehicle. Allegedly, small amounts of marijuana were seen inside the vehicle but which were never collected. The purpose of the search is also shown by fact that Detective Kirkby searched Mr. Sereme, who was the target of the cocaine investigation, rather than Pierre,

9

the driver of the vehicle. In an unguarded moment during his testimony, Detective Kirkby conceded "we knew they weren't your average drug dealers, if that's what you are asking me. I mean they were very important people, so the possibility of having firearms was definitely on our mind. I mean we're not talking about guys that have a couple of grams of weed or coke." (Tr. Pgs 110-111). Even had there been some legal basis to search Mr. Sereme for marijuana that the officers suspected had not been consumed in the vehicle, there was clearly none to search him for cocaine.

In this regard, the Report states "the true source of the (marijuana) odor was never found." (Doc. 189: Pg 11). Assuming that there was such an odor, its "source" would be the marijuana which, according to the government's claim, had been smoked in the car. To the extent that the Court credits the allegation that there were residual or "shake" marijuana ground into the carpet of the vehicle, there was no reason to believe that this was not the "source."

The claim that Detective Kirkby felt something in Mr. Sereme's buttocks area during the *exterior* pat-down search, it is respectfully submitted is, at best, unlikely. If such an object could be felt, it would have been felt by Deputy Hedrick during the initial pat-down search. Moreover, Detective Kirkby's search, as reflected on the video, belies his contention that he already felt an object. Instead of going immediately to the area where claims to have felt the object, Detective Kirkby first began to probe Mr. Sereme's genital

area.[2] Before physically retrieving the bags found in Mr. Sereme's buttocks area, Detective Kirkby first probed the area through Mr. Sereme's underwear, indicating that he was simply searching as opposed to retrieving something he had already felt. Then, and only then, did he position Mr. Sereme so as to reveal the bags of cocaine. Additionally, given Mr. Sereme's build, and the location of the bags, it is unlikely that they could have been felt through clothing, regardless of how tight.  In fact, the pants Mr. Sereme was wearing were thick jeans, thus making it less likely that an object could be felt through the jeans. Finally, the position of the bags of cocaine, as reflected in the video, make it even more unlikely that a frisk would have caused the officer to feel the bags.

Finally, again while not necessary to the resolution of this issue, Mr. Sereme disputes the contention that there *was* probable cause to believe that he was carrying contraband. He additionally, disputes that there was even reasonable suspicion justifying an investigative detention.

The vehicle was stopped for a routine traffic violation. Mr. Sereme presented valid rental documents. Mr. Pierre indicated that there might be a small amount of marijuana left within the vehicle. Deputy Hedrick quite thoroughly searched the vehicle, but discovered no contraband. This should have been sufficient to dispel any reasonable concern that there may have been additional contraband within the vehicle. *See Royer*, 103 S. Ct at 1325 ("an investigative detention must be temporary and last no longer than is necessary

---

[2] Detective Kirkby took exception to the suggestion that he had probed Mr. Sereme's genital area. (Doc. 179: Pg 132). However, he conceded that a still image from the video "doesn't look too good." (Tr. Pg 132).

to effectuate the purpose of the stop."). The allegation that Mr. Sereme smelled of marijuana, assuming the Court credits such an untestable allegation, does not mean there was probable cause to believe that as the  passenger of the vehicle, that he continued to have marijuana on his person.

**B.     The Initial Stop Was Unlawful**

While not Mr. Sereme's primary argument, the Report incorrectly states that "there is no contention that the initial stop for illegal window tint and speeding was unlawful." Doc. 189: Pg 23. Mr. Sereme's initial motion did specifically assert that the government would have to establish the validity of the stop. (Doc. 120: Pgs 9-10).  Although, Mr. Sereme did not focus on this in his argument to the Court, he did not abandon it either.  At the same time, Mr. Sereme recognizes that there was testimony that the window tint on the vehicle did, in fact, was darker than Florida law permits and Deputy Hedrick insisted that he had passed the car traveling in excess of the posted speed.  (Tr. Pgs 66).  However, some points  do need to be made on this matter. Agent Davis testified that he instructed the Deputy Hedrick to "develop his own probable cause " for the yet-to-occur traffic stop. Tr. Pg 24). Thus, before the traffic stop, there was an assumption by the officers that there would be such probable cause would be "developed." Agent Davis conceded that he remained in the area anticipating that the vehicle would, in fact, be stopped.(Tr. Pg 41). This was before any alleged observations by the Deputy Hedrick which are now being suggested to justify the stop. (Tr. Pg 41). This puts untested claims, such as the vehicle was speeding and that Deputy Hedrick was able to see the tint level at night from behind,

in some perspective. Mr. Sereme does not concede these claims.

The Report is correct, however, that the primary issue with respect to the stop is whether it was unlawful in light of *United States v. Jones*, 565 U.S. ---- , 132 S. Ct. 945 (2012),  because it resulted from GPS (or more precisely here "cell-cite activation"), monitoring . In *Jones*, the Supreme Court recently held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. In so holding, the Court clarified that the formulation enunciated in *Katz v. United States,* 389 U.S. 347, 351 (1967), *i.e.,* that a search occurs when "a defendant's expectation of privacy" is breached, is only part of the Fourth Amendment analysis. Rather the Court concluded that "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." 132 S. Ct. at 952. (emphasis in original). Thus, the act of placing the device on the vehicle constituted a trespass, and therefore a search, notwithstanding the government's argument that the defendant had no expectation of privacy as to his whereabouts.

In concluding that no search occurred, the Report  observed that this case did not involve the installation of a device on the vehicle, and therefore did not come within the express holding of the majority in *Jones*. (Doc. 189: Pgs 18-19). While this is true, a clear majority of the Court concluded that it was not the installation of the device which triggered Fourth Amendment protections, but rather the long-term monitoring of a person's whereabouts.

In a concurring opinion in *Jones*, Justice Alito found the majority opinion to be

unnecessarily limited. Joined by three other members of the Court, he wrote ". . .  the Court's reasoning largely disregards what is really important (the use of a GPS for the purpose of long-term tracking) and instead attaches great significance to something that most would view as relatively minor (attaching to the bottom of a car a small, light object that does not interfere in any way with the car's operation)." *Id.* at 961. (Alito, J., concurring). Justice Alito further suggested that the best approach is "to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated." *Id.* at 964.  Based upon this analysis, Justice Alito concluded that "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.*  Because the GPS device permitted the long-term tracking of the defendant in *Jones*, Justice Alito concurred with result reached by the majority. Justice Sotomayor, in a separate concurring opinion, similarly agreed with Justice Alito's opinion, stating " . . .  I agree with Justice Alito that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" *Id* at 955. (Sotomayor, J. concurring).[3]  Thus, while *Jones* was decided without reaching the broader question, five members of the Court expressed the clear view that at least long-term GPS monitoring constitutes a search, regardless of whether the object is placed on the vehicle by the police.

---

[3] The Report incorrectly stated that the majority view was reflected in Justice Alito's concurring opinion. (Doc. 189: Pg 18). However, the majority view included the four member concurring opinion written by Justice Alito, and the individual concurring opinion by Judge Sotomayor.

Here, the government had obtained an order from a state judge which instructed the wireless carrier to provide the location of the cell phone in question at any time requested for a period of sixty days. The court concluded, in fact, that Mr. Sereme's whereabouts was monitored for twelve days before the December 20, 2010 stop.  Further, the order permitted the tracking of the phone across jurisdictional lines, here tracking the phone from Miami-Dade County to Lee County.

Mr. Sereme maintains that the interception of his movements by the use of a cell-cite tracking constituted a warrantless search in violation of the Fourth Amendment. For this reason, the stop was unlawful.

## C.    The Detention Was Unlawful

Mr. Sereme continues to maintain that even had the stop been lawful, and the resulting search otherwise valid, the search was nonetheless unlawful as it was the product of his unlawful detention.

## D.    The Exclusionary Rule and the "Fruit of the Poisonous Tree"

Mr. Sereme seeks to exclude: (1) all evidence derived directly from the traffic stop, including the cocaine and all statements he made during the traffic stop; (2) all evidence derived from the traffic stop, or which was obtained by exploiting the traffic stop, including but not limited to the recorded conversations while Mr. Sereme was incarcerated as a result of the December 20, 2010 seizure[4], and (3) all conversations intercepted pursuant

---

[4] As this position was specifically set forth in Mr. Sereme's motion, the Report is incorrect in indicating that Mr. Sereme sought suppression of these conversations for the first time at the hearing. (Doc. 189 Pg. 29 n.6)(Doc. 120: Pg. 15).

to the Title III wiretaps. (Doc. 120).

Beginning with *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341 (1914), the Supreme Court created an evidentiary exclusionary rule to effectuate Fourth Amendment rights. *Weeks* barred physical evidence directly obtained through an illegal search from being used against the victim of the search in a federal criminal prosecution. In *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182 (1920), the Supreme Court held that the exclusionary rule applied to knowledge obtained by violation of the Fourth Amendment, as well as tangible materials obtained by the violation. Also included within the scope of the exclusionary rule are overheard verbal statements and testimony about matters observed during the Fourth Amendment violation. *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, "[e]vidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

In *Silverthorne,* the Supreme Court extended the exclusionary rule to include indirect products, as well as the direct products, of a Fourth Amendment violation. *Wong Sun*, 371 U.S. at 484–85, 83 S.Ct. 407. *Silverthorne* precluded the government from using not only the illegally obtained evidence itself, but also barred the use of information obtained during the unlawful search to craft a subpoena to obtain the illegally viewed documents from the victims of the Fourth Amendment violation. *Wong Sun* precluded not only the use of verbal statements by a defendant after a warrantless arrest in his residence, but narcotics seized from another person who was discovered by exploiting the defendant's statements. *Wong*

16

*Sun* stated the now-familiar standard:

> We need not hold that all evidence is "fruit of the poisonous tree"
> simply because it would not have come to light but for the illegal
> actions of the police. Rather, the more apt question in such a case is
> "whether, granting establishment of the primary illegality, the evidence
> to which instant objection is made has been come at by *exploitation*
> of that illegality or instead by means sufficiently distinguishable to be
> purged of the primary taint."

*Wong Sun*, 371 U.S. at 487–88, 83 S. Ct. 407 (emphasis added).

Under the exclusionary rule, evidence obtained in an encounter that is in violation

of the Fourth Amendment, including the direct products of police misconduct and evidence

derived from the illegal conduct, or "fruit of the poisonous tree," cannot be used in a

criminal trial against the victim of the illegal search and seizure. *United States v. Perkins*,

348 F.3d 965, 969 (11th Circuit 2003)(citing *United States v. Terzado–Madruga*, 897 F.2d

1099, 1112 (11th Cir.1990)). When determining whether evidence is "fruit of the poisonous

tree" and therefore must be excluded, the relevant question is "whether, granting

establishment of the primary illegality, the evidence to which instant objection is made has

been come at by exploitation of that illegality or instead by means sufficiently

distinguishable to be purged of the primary taint." *United States v. Delancy,* 502 F.3d 1297,

1309 (11th Cir.2007) (quoting *Wong Sun,* 83 S. Ct. at 417).

Accordingly, "[e]vidence seized after an illegal seizure should be suppressed as the

'fruit of the poisonous tree.' " *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir.2002).

*United States  v. Myers* 290 F. App'x. 305, 308 (11th Cir. 2008)(remanded because the

district court failed to determine whether a defendant's consent to search the residence

was tainted by a prior illegal search); *Staples v United States,*  320 F2d 817 (5th Cir. 1963)(error to admit evidence of a large amount of counterfeit money discovered in a motel room which police searched after finding the keys thereto in the course of an unlawful search of the defendant's automobile); *United States v. Bergin*, 732 F. Supp.2d 1235, 1249-1251  (M.D. Fla.2010)(defendant's consent to search her residence was tainted by prior illegal entry by the police).

The government conceded at the hearing that should the search be found unlawful, the cocaine and the jail calls would have to be suppressed. (Doc. 179: Pg 175). This is clearly correct. *See United States v. Chanthasouxat,* 342 F.3d 1271, 1281(11th Cir. 2003) (recorded statements made between the defendant and a co-defendant in the back of a police car following what was found to be an unlawful automobile stop and search must be suppressed).

Under the above principles, Mr. Sereme maintains that the identifications of his voice on the wiretapped conversations must also be suppressed, as Agent Davis candidly recognized that the recorded jail conversations were used to make these identifications. Agent Davis listening to the recorded conversations, and also listened to the intercepted conversations on both target phones. (Tr. Pgs 42-43). He used the recorded jail conversations for comparison. (Tr. Pg 45). Special Agent Chris Brannan, and Detective John Armado have listened to the conversations, and have made voice identifications. (Tr. Pg 43-44). Although Agent Davis at first maintained that he only "partially" made voice identifications of Mr. Sereme using the recorded jail conversations, he admitted that he did

not have any other voice samples of Mr. Sereme beyond the jail conversations. (Tr. Pgs 45-46). The only other factors he cited as bearing on voice identifications were nicknames of Mr. Sereme ("Poppie" or P.O."), and observations made through the use of a "pole camera surveillance." (Tr. Pgs 57-58). However, with respect to the latter, he was only able to say "I believe there might have been a phone call where Mr. Sereme said he was coming to the Kimble address and then the pole camera showed maybe several minutes later him on camera; but I'd have to go back through my notes along with the intercepted communications to verify that." (Tr. Pg 61). Of course, there is a difference between a true voice identification, and law enforcement officers simply trying to piece together who is speaking by context. Agent Davis' testimony confirms that the only true voice identification has been made by the use of the tainted jail house calls. Therefore, any voice identification of Mr. Sereme should be suppressed as the fruit of the poisonous tree.[5]

Mr. Sereme suggests that the same result is required with respect to the Title III intercepts themselves. All of the three wiretaps, two of (239) 384-1052 (the Rick Jean line), and one of (754) 244- 3916 (the Nehme Ductant line), are interdependent. Agent Davis conceded that the primary probable cause for the second authorization of the Rick Jean line was the communications intercepted as a result of the first authorization on the same line. (Tr. Pg. 50). Similarly, the primary probable cause for the Nehme Ductant line,

---

[5] Of course, any efforts to remedy this problem, for example, by having others listen to selected conversations for the purposes of making an identification, must be carefully scrutinized to determine whether any prior tainted identifications in turn tainted such a process.

and, in fact, the even the knowledge of the number itself, came as a result of the initial Rick Jean line intercept. (Tr. Pg 51). Therefore, if the Court were to conclude that the initial Rick Jean intercept order was the product of the December 20, 2010 search, the second Rick Jean intercept order, as well as the Neheme Ductant intercept order, and all resulting conversations, are similarly the fruit of the poisonous tree.

It appears that Mr. Sereme's jail calls were central to the determination that the Rick Jean line was being used for drug-related conversations. The initial application for this line stated that the "Probable Cause For Target Telephone" was a jail call made from Mr. Sereme to Rick Jean on the target telephone, discussing the stop; a jail call from Sereme to another number advising that there was to be no more calls from the jail; an allegedly drug-related  call during the week of  May 23, 2011 from an informant to Rick Jean on the target telephone; allegedly drug-related  text message exchanges from Rick Jean and an informant during the week of June 27, 2011; allegedly drug-related text messages from an informant to Mr. Jean allegedly relating to a drug transaction occurring during the week of July 4, 2011. (Defense Exhibit D Pgs 24-29, ¶ 29).

Agent Davis testified initially that the Rick Jean telephone number had been provided by a confidential source. (Tr. Pg 26). However, he could not say when, believing it to be around May or June. (Tr. Pgs 47-48). He conceded that there is no documentation that this number was known before December 2010. When asked whether he first learned of the Rick Jean number as a result of Mr. Sereme's jail calls, Agent Davis stated "not necessarily," but was unable to be more specific. (Tr. Pgs 48-49). He conceded that merely

knowing the number was of "very minuscule" assistance in the investigation. (Tr. Pg 59). However, he did testify that an informant spoke to Rick Jean on this telephone line in either May, June, or July of 2011.  (Tr. Pgs 59-60). It was at that point, he claimed, that he went to the jail management system to check and see if the number had any recorded calls to it. (Tr. Pg 60). Because, both the existence of the Rick Jean line, and the basis for alleging it was being used with respect to drug activity, were based upon Mr. Sereme's jail conversations, the wiretapped conversations should be suppressed.

Mr. Sereme further argued that the probable cause for the wire-tap applications was dependent upon the December 20, 2010 search and seizure, and, therefore, if the search was invalid, the wiretap applications, and resulting conversations, were as well. The Report, however, concluded that "even with the exclusion of the of the information regarding the December 20, 2010 traffic stop, as well as the jail calls, the Court recommends that there was independent probable cause for the Court to determine that cellular number (239) 384-1052 was being used in unlawful activity, therefore the order was issued upon probable cause and suppression is not warranted." (Doc. 189: Pg 32). Mr. Sereme is mindful that the Eleventh Circuit  has held that "where a search warrant  is based on information acquired as a result of an illegal entry, we must look to whether the other information provided in the affidavit is sufficient to support a probable cause finding." *United States v. Chavies*, 169 F.3d 687, 692 (11th Cir. 1999) (citing *United States v. Glinton*, 154 F.3d 1245, 1254–55 (11th Cir.1998)), *see also*, *Franks v. Delaware, 438 U.S.* 154, 98 S. Ct. 2674, 2684  (1978*); and *United States v. Novaton,* 271 F.3d 968, 986 (11th

Cir.2001) (Under *Franks*, if a defendant makes a threshold showing that the affiant deliberately or recklessly made a false statement, the defendant is entitled to a hearing; if that threshold showing of deliberate or reckless falsity is then proved by a preponderance of the evidence, the defendant is entitled to a new evaluation of probable cause with the affidavit stripped of the false statements). *Franks,* 98 S. Ct. at 2684–85.[6]

With respect to the probable cause that the individuals were involved were in criminal activity, the initial application for the Rick Jean line, alleged (1) that Mr. Sereme had been arrested on drug charges in 2006, but that there was insufficient evidence to prosecute;  (2) information had been provided by three informants,  referred to as CS 1,2, and 3 as to their alleged drug-distribution involvement with the target individuals; (3) there

---

[6]   The Report used the *Franks* analysis, *i.e.*, excluding the potentially-tainted allegations and determining whether probable cause was stated by the remaining allegations. At the time that *Franks* was decided, the Supreme Court's test for probable cause was somewhat mechanical. *See Spinelli v. United States,* 393 U.S. 410 (1969); and *Aguilar v. Texas*, 378 U.S. 108 (1964) (probable cause requires the basis of an informant's knowledge and his or her reliability to be established). Subsequent to *Franks,* the Supreme Court in *Illinois v. Gates,* 462 U. S. 213, 231 (1983) replaced the  *Spinelli-Aguilar* test with a "totality of the circumstances" test, and stated  "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules". Similarly, in *United States v. Leon* 468 U.S. 897,914 (1984), the Court recognized the good faith exception to Fourth Amendment in warrant context, and stated "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." (citations omitted).  The problem with the continued use of the *Franks*  analyses is that it presumes that the issuing magistrate *would* have chosen to issue the warrant even in the absence of the tainted or false information. It may very well be, however, that to the individual  issuing magistrate the tainted allegation was crucial to a probable cause determination, even if the reviewing court determines that probable cause *could* of been found in its absence.

were pending drug-related kidnaping charges against three target subjects (not Mr. Sereme); (4) the allegation by CS 1 and CS 2 that target individuals would regularly travel back from Miami to Fort Myers with cocaine, which was "verified in December 2010, when Sereme was arrested on his way back to Fort Myers from Miami." The application further summarized the facts of the December 20, 2010 seizure; (4) the alleged drug related jail calls made by Mr. Sereme to Rick Jean and other target individuals; (5) a wire-transfer by defendant Wesley Jean in April 2011. (Defendants Ex. D Pgs 12-22, ¶¶ 10-24).

While the information provided by the informants may well have been specific, there are always questions of credibility with respect to such individuals. *See Gates* 462 U.S. at 232 ("an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report."). Indeed, Agent Davis acknowledged that he would not have even sought an intercept order based on information supplied by the informants alone. (Tr. Pgs 52-53). To establish the reliability of the informants, the application relied heavily on the jail calls made by Mr. Sereme and the traffic stop, which "verified" the information provided by the informants. While the Report maintained that there was sufficient non-tainted evidence to state probable cause, Mr. Sereme maintains that the allegations with respect to this traffic stop were crucial. Therefore, he maintains that the intercept orders were the product of the traffic stop. Accordingly, the wiretapped conversations as evidence against Mr. Sereme must be suppressed.

WHEREFORE, the Defendant moves this Court to sustain his objections to the Report and Recommendation and grant his motion to suppress.

Respectfully submitted,

DONNA LEE ELM
Federal Defender

/s/ Russell K. Rosenthal
Russell K. Rosenthal
Florida Bar No. 0319244
Assistant Federal Public Defender
1514 Broadway Suite 301
Fort Myers Florida 33901
Telephone: 239 334-0397
Fax: 239 334-4109

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of April 2012, a true copy of the

foregoing filed in this court and a copy was forwarded  by electronic mail to Jesus Casas

Office of the United States Attorney, 2110 First Street  3-137 Fort Myers, Florida, Ft.

Myers, Florida 33901.

/s/ Russell K. Rosenthal
Russell K. Rosenthal

24